File Date: _2-11-2008_

Case No: _08cv939_

ATTACHMENT # _3_

EXHIBIT _____

TAB (DESCRIPTION)
Proceedings from 1/6/2005

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CRIMINAL DIVISION
SECOND DISTRICT

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )
    -VS-             )   No.  04 CR 5900
                     )
DWAYNE GRIFFIN.      )

***REPORT OF PROCEEDINGS***

BE IT REMEMBERED that the above-entitled

cause came on for JURY TRIAL    before the

Honorable  SHARON M. SULLIVAN , Judge of said

Court, on the  6th day of  January, A.D., 2005, in

Skokie, Illinois, Courtroom  209.

APPEARANCES:
    HON. RICHARD DEVINE,
        State's Attorney of Cook County, by:
    MS. STEPHANIE CALLAS and LORI SCHULTZ,
        Assistant State's Attorneys,
            on behalf of the People;

    MR. DWAYNE GRIFFIN,
        appeared Pro Se.

MARIETTA DEL PRETO, CSR, 84-1328
Official Court Reporter
5600 Old Orchard Rd.- Rm. 204
Skokie, IL  60077

P - 1

```
 1                        I N D E X

 2     People Vs. Dwayne Griffin

 3     Case No. 04 CR 5900

 4     January 6, 2005

 5

 6     Jury Trial

 7     Pgs. P-1 - P-141

 8

 9     Opening Statement by Ms. Callas   P. 8

10     Opening Statement by Mr. Griffin   P. 10

11
```

| Witnesses | DX | CX | RDX | RCX |
|---|---|---|---|---|
| Officer Blomstrand | 12 | 24 | 37 | 40 |
|  | 49 | 50 |  |  |
| Officer Lee | 53 | 60 |  |  |
| Yvette Nueva | 67 | 78 | 90 | 93 |

Opening Closing Argument by Ms. Schultz   P. 113

Closing Argument by Mr. Griffin   P. 119

Closing Argument by Ms. Callas   P. 126

Jury Verdict      P. 135

Reporter's Certificate    P. P-141

1          THE CLERK:  Dwayne Griffin.

2          THE COURT:  I understand all jurors are

3     present.  Before we begin, one question initially I

4     asked the Public Defender in the courtroom to stay

5     in the courtroom.  They do have civilian clothes in

6     their office, and so, they are happy to make those

7     available to you for you to be dressed in civilian

8     clothes.

9          THE DEFENDANT:  No.  I'm okay, your Honor.

10         THE COURT:  You're saying you do not want them

11    to give you civilian clothes?

12         THE DEFENDANT:  No, ma'am.

13         THE COURT:  You don't want them.  Even if I

14    have them bring them down to the courtroom --

15         THE DEFENDANT:  I don't want them.

16         THE COURT:  -- you're not going to wear them?

17         THE DEFENDANT:  No, but I would like to make

18    one statement or argument that everyone that didn't

19    appear -- anyone that didn't appear before Judge

20    Gerald T. Wienicki on February 27th, that they be

21    barred from giving statements today.  That's a

22    violation of my Constitutional rights.

23         THE COURT:  Based on what authority, sir?

24         THE DEFENDANT:  Of my Constitutional right of

1    due process of the law of a fair trial.  Anyone

2    that didn't appear at the preliminary hearing

3    shouldn't be allowed to be able to give statements

4    today in these proceedings, ma'am.

5        THE COURT:  State, do you want to respond to

6    his motion in limine?

7        MS. CALLAS:  Yes, Judge.  In response to his

8    motion in limine, a preliminary hearing is more

9    probable than not that a crime has been committed.

10   Hearsay is accepted within preliminary hearing, and

11   a preliminary hearing is just that, preliminary.

12   That does not bar us, by any way -- there's

13   absolutely no case or no authority to bar any

14   witnesses from testifying in this case that have

15   been disclosed to the defendant.

16            The defendant has the police reports.

17   He's fully aware of the witnesses that we will be

18   calling.  They are the officer on that report as

19   well as the lady from Blockbuster who testified at

20   the preliminary hearing, and we'd ask that that

21   motion be denied.

22        THE DEFENDANT:  For the record, your Honor,

23   the defendant also still doesn't have the offense

24   arrest report that the police initially charged him

1    with.  He doesn't have that arrest report, the
2    offense arrest report.
3         THE COURT:  Your motion is denied.  Any other
4    matters before we bring the jury in?
5         MS. CALLAS:  Yes, Judge.  I'd just like to
6    reiterate one more time that the report that the
7    defendant's talking about does not exist.  Also, he
8    indicated by showing Xeroxed copies of photographs
9    that he believed there were two -- it showed two
10   windows broken or something to that effect.
11              We do have extra color copies for the
12   purpose of this trial.  If the defendant wishes to
13   use these photographs which are actual photographs,
14   he may.
15        THE DEFENDANT:  Okay.  Thank you.
16        MS. CALLAS:  You're welcome.  And then, do you
17   want --
18        THE COURT:  We're going to begin with opening
19   statements.  They moved -- the podiums were in the
20   middle of the courtroom.  They've been moved to the
21   side.  Where are you going to address the jury
22   from?
23        MS. CALLAS:  I was going to do my opening
24   here.  I can do my exams there.  It doesn't matter.

1          THE COURT:  For purposes of opening statement,

2     they can be done in the center area here, if that's

3     all right with the defendant.  For questioning the

4     witnesses, you can either question them from the

5     desk you're seated at or the podium that's there;

6     or if you need to use the center well of the

7     courtroom, you can, but do not approach any

8     witnesses without asking leave of Court.  Even if

9     you want to present them with a document, first

10     please ask leave of Court before going up to any

11     witness.  I will then have the deputies provide

12     those documents or photographs, whatever they may

13     be, to the witness.

14          MS. CALLAS:  Judge, how do you want to address

15     sidebars and things of that nature?

16          THE COURT:  It's going to be a little bit

17     difficult.  Hopefully, we'll try to do them at the

18     side outside the ear shot of the jury, if we need

19     to.

20          MS. CALLAS:  She's indicating --

21          THE DEFENDANT:  Your Honor, also defense has

22     made copies of the photographs that was given to

23     him.  I also made copies for the jury, to present

24     to the jury as evidence, also.

1          THE COURT:  Let's wait until we're at the

2     defendant's case.

3          THE DEFENDANT:  Okay.

4          THE COURT:  At that point in time, we'll

5     determine what can be shown to the jury what's been

6     admitted into evidence.

7               Anything else that we need to address

8     before we bring the jury in?

9               We're ready for the jury then.

10         A DEPUTY:  All rise for the jury.  Jury is

11    present and accounted for.

12         THE COURT:  Thank you.  Please be seated, and

13    good morning, everyone.  And I thank all of you,

14    and I'm very impressed by the fact that you were

15    all here.  You were all here on time, and I know,

16    you know, how inclement it is out there.  So, I

17    truly appreciate the consideration you've shown to

18    the Court and to each other.

19              At this time, I'm going to ask the clerk

20    to have you sworn in as jurors in this case.  So,

21    if you would please stand, and raise your right

22    hands.

23                   (Jury sworn.)

24         THE COURT:  The deputies have provided you

P - 7

1    with note pads and pencils.  Let me just tell you.

2    It used to be that jurors weren't given note pads

3    and pencils.  Some of you didn't, maybe.  Now,

4    they've changed those rules, and you are provided

5    with them.  That does not mean you have to take

6    notes.  It's for your convenience.

7         If you'd like to take notes, if it helps

8    you, please feel free to do so.  At the end of the

9    case when you go back to deliberate, I'll instruct

10   you again that you're not to tell your fellow

11   juror, hey, look it.  I wrote it down like this.

12   So, this is what the evidence was.  Each of you are

13   to discuss the case fully at the time of

14   deliberations and use your notes for your purposes

15   and to the extent they help you.

16        At this time, we're ready to begin the

17   case.  We'll begin with opening statements.  The

18   State will proceed first.

19        Does State wish to make an opening

20   statement?

21       MS. CALLAS:  Yes.

22       THE COURT:  Ms. Callas.

23       MS. CALLAS:  Ladies and gentlemen, this is a

24   very simple case that you're going to hear today.

1    What this case is about is about Dwayne Griffin.

2    It's about how, on February 21, 2004, at about 4:30

3    in the morning, he decided that he wanted some

4    movies.  And so, he went to the Blockbuster, busted

5    in the window, and started grabbing everything he

6    could.

7              But, of course, he couldn't carry all of

8    it.  So, he grabbed everything he could, and he

9    took it to a nearby garbage can, and he put in the

10   garbage bag, and he went back, and he got more.

11   What he didn't count on was that the police were

12   going to pull up and see Dwayne Griffin standing

13   outside that window holding a bunch of videos on

14   one of his runs.

15             He sees the officer, drops them.  After

16   he drops them, he proceeds to walks away.  When the

17   officer approaches, he takes him into custody.  At

18   that point, another officer is able to recover all

19   of those additional videos out of the garbage bag.

20             You're going to hear from the lady who's

21   the manager who worked at the Blockbuster at that

22   time who's going to tell you that all of those

23   videos that were recovered belonged to

24   Blockbuster.  You're going to see that most of them

1    say Blockbuster on the side of them.

2         Nobody knew this defendant.  Nobody gave

3    him permission to bust into that Blockbuster at

4    4:30 in the morning.  And at the end of the case,

5    after you've heard all the evidence, we're going to

6    ask that you return a finding of guilty.

7         THE COURT:  Thank you, Ms. Callas.

8         Mr. Griffin?

9         THE DEFENDANT:  Yes.  Ladies and gentlemen,

10   before I proceed today, I would like to send out my

11   sympathy for the lady here.  I heard, you know,

12   when you was giving your statement yesterday to

13   what happened to you, my mother and my sister --

14        THE COURT:  Mr. Griffin.

15        THE DEFENDANT:  -- had that happen to them,

16   and I would just like to say my prayers and

17   sympathies out to you.

18        THE COURT:  That's enough on that topic.

19        THE DEFENDANT:  But any way, ladies and

20   gentlemens of the jury, when I say conspiracy, when

21   I say obstructing of justice, when I say due

22   process of the law, when I say wrongfully

23   incarcerated, when I say lying, it's perjury under

24   oath.  They want you to believe that, but today,

1    today, they have the wrong man.

2            When you hear and see the evidence,

3    you're going to say impossible for him.  He

4    couldn't do it.  It was an inside job.  February

5    the 20th, 2004, I was picked up by the Chicago

6    Police.  I was locked in the 14th District Police

7    station.  I was then taken to the Cook County

8    Jail.  After that, I appeared before a Judge, Judge

9    Gerald T. Wienicki, for a preliminary hearing.

10            I have in my possession, I have 12 copies

11    for your viewing pleasure, and I'm now here today

12    on a crime.  After you hear the statements and the

13    evidence, I'm going to tell you stop lying, stop

14    picking up innocent people and giving them cases.

15            What evidence?  The evidence is going to

16    be against them, against them.  They have no

17    evidence.  You can go against some things and say

18    here he be, but it's evidence they want you to

19    believe.  God is my witness is going to tear it

20    down and let the Cook County State's Attorney know

21    enough is enough, and he didn't do it.  You're

22    lying.  He didn't do it.  You can't prove it.

23            Conspiracy, obstructing of justice,

24    planting evidence, concealing and destroying

1     evidence, falsifying statements, hiding and

2     stealing evidence.  You're going to hear statements

3     from the police.  Today, you're going to know it

4     ain't nothing but a conspiracy.

5               Nothing else, your Honor.

6          THE COURT:  Thank you, Mr. Griffin.

7               At this time, the State will present

8     their evidence.  They may call the first witness.

9          MS. CALLAS:  At this time, the People call

10    Officer Matthew Blomstrand.

11                         (Witness sworn.)

12

13                    OFFICER MATTHEW BLOMSTRAND,

14    A witness called on behalf of the People of the

15    State of Illinois, having been first duly sworn,

16    was examined and testified as follows:

17                    DIRECT EXAMINATION

18                    BY MS. CALLAS:

19         Q    Officer, could you please introduce

20    yourself to the ladies and gentlemen of the jury,

21    and spell your last name for the benefit of the

22    court reporter?

23         A    Officer Blomstrand, B-l-o-m-s-t-r-a-n-d,

24    star No. 15875.

1        Q      And are you a Chicago Police Officer?

2        A      Yes.

3        Q      Where are you currently assigned?

4        A      The 25th District.

5        Q      And where were you assigned on February

6    21st of the year 2004?

7        A      At that time, I was assigned to the 14th

8    District.

9        Q      How many districts are there in Chicago,

10   police districts?

11       A      25.

12       Q      And do those police districts make up for

13   geographical areas?

14       A      Yes.

15       Q      Now, when you were assigned to the 14th

16   District, what are the boundaries of that district?

17       A      It's Belmont on the north, Division on

18   the south, Central Park on the west, and the river

19   on the east.

20       Q      Now, how long have you been a police

21   officer?

22       A      Approximately two and a half years.

23       Q      Directing your attention back to February

24   21st of 2004, do you recall what shift you were

1    working?

2         A    I was working first watch.

3         Q    And could you please tell the ladies and

4    gentlemen of the jury what the hours are for first

5    watch shift?

6         A    My hours for that were 11:00 at night

7    until 7:00 in the morning.

8         Q    Were you working alone that day or with a

9    partner?

10         A    I had a partner.

11         Q    What was your partner's name?

12         A    Officer Prill.

13         Q    Is that P-r-i-l-l?

14         A    Correct.

15         Q    And were you and your partner in full

16    uniform?

17         A    Yes.

18         Q    Like you are here today?

19         A    Yes.

20         Q    And what type of vehicle were you in, if

21    any?

22         A    That night, we were in a squadrol, a

23    police squadrol which is basically the wagon that

24    we use to transport prisoners in.  It's basically a

1    bigger police vehicle.

2          Q    It's not an old police car?

3          A    No.

4          Q    It's large?

5          A    Yes.

6          Q    Does it say Chicago Police Department on

7    it?

8          A    Yes.

9          Q    Does it have any police lights?

10         A    Yes, ma'am, it does.

11         Q    And sirens?

12         A    Correct.

13         Q    Okay.  Do you recall at approximately

14   4:28 in the morning responding to the location of

15   1303 North Milwaukee Avenue in Chicago, Cook

16   County, Illinois?

17         A    Yes, I do.

18         Q    Why did you respond to that location?

19         A    While on patrol, we were monitoring the

20   radio, and we heard come over the air that there

21   was a burglary in progress at the Blockbuster at

22   that location.

23         Q    Did you go there?

24         A    Yes, we did.

1      Q      When you first pulled in -- Please
2    describe what's at 1303.  Is it just a Blockbuster
3    there on Milwaukee, or what is it?
4      A      It's a strip mall with various other
5    stores.  There's a Jewel there.  There's a K-Mart,
6    and a few other stores.
7      Q      And this is at about 4:30 in the morning?
8      A      Correct.
9      Q      Were the stores in that strip mall closed
10   at that time?
11     A      Yes.
12     Q      Do you know if there was anything open?
13     A      Just the Dunkin' Donuts which was at the
14   opposite end of that strip mall.
15     Q      Now, when you pulled in, who is the first
16   person you saw?
17     A      When we pulled into the lot, we noticed a
18   gentleman on a pay phone.  And as we pulled in, he
19   was pointing towards the Blockbuster, waving us
20   towards the Blockbuster.
21     Q      Did you then go to the Blockbuster?
22     A      Yes.
23     Q      When you got to the Blockbuster, what did
24   you see?

1        A      As we pulled up, I saw the defendant

2    standing in front of a broken window holding in his

3    hands several DVD cases and VHS tapes.  And then,

4    he looked in our direction, at which time we made

5    eye contact, at which time he dropped those cases

6    and started to walk away from the window.

7        Q      And when you say the defendant, do you

8    see the person who you're referring to as the

9    defendant here in court today?

10       A      Yes, ma'am, I do.

11       Q      Can you please point that person out, and

12   identify an article of clothing that person is

13   wearing?

14       A      Yes.  It's the gentleman sitting down

15   over there wearing the tan DOC outfit.

16       MS. CALLAS:  I'd ask that the record reflect

17   the in-court identification of the defendant.

18       THE COURT:  Yes.

19       MS. CALLAS:

20       Q      Now, about how far from -- describe the

21   window.

22       A      It's kind of like a large picture window,

23   but there's separate panes of glass.  There's

24   little windows in them.  There was probably like a

1    four by four pane of glass, like twelve panes, I

2    believe.

3        Q    And one of them was broken?

4        A    Yes.

5        Q    How far was the defendant, when you first

6    saw him, from that window?

7        A    Within an arm's length of the window.

8        Q    And he had all these items in his hands?

9        A    Correct.

10       Q    After he dropped those items and walked

11   away, what did you do?

12       A    That's when I exited my vehicle,

13   announced my office, and I took him and placed him

14   into custody.

15       Q    After you took him into custody --

16   Actually, let me back up.

17            What were the lighting conditions like at

18   4:30 in the morning at that Blockbuster?

19       A    It was dark, but there was artificial

20   lighting in the parking lot.

21       Q    Those large lights you see?

22       A    There was ample light.

23       Q    After you took him into custody, did

24   anyone else from the police department come?

1        A     Yes.   Two other officers pulled up.

2        Q     Do you recall their names?

3        A     Officer Lee and Officer, Pargoni

4    (phonetic).

5        Q     That was after you had taken the

6    defendant into custody?

7        A     Yes.   I handcuffed him, and then, that's

8    when they arrived.

9        Q     When they arrived, did any other civilian

10   approach you?

11       A     Yes, they did.

12       Q     Who approached you?

13       A     The gentleman that was on the telephone

14   that directed us to the Blockbuster approached, and

15   we had a conversation.

16       Q     Do you now know that person's name to be

17   Jose Pagan?

18       A     Yes, I do.

19       Q     Jose Pagan had a conversation with you

20   and your fellow officers?

21       A     Yes.

22       Q     After that conversation, did any of your

23   fellow officers leave the area where you work?

24       A     Officer Lee did.

1        Q      Where did she go?

2        A      She walked to a garbage can that was

3    located approximately 250 feet away from the broken

4    window and retrieved a garbage bag that was

5    containing several more DVD cases and VHS tapes.

6        Q      Can you describe -- could you see the

7    garbage can?

8        A      Yes, I could.

9        Q      Can you describe what kind of garbage can

10   it was?

11       A      It was a wire basket garbage can with a

12   top on it that, when you lift it, you can pull the

13   garbage bag out.

14       Q      And after you observed Officer Lee

15   recover this bag, what did she do with it?

16       A      I saw her place it in her vehicle and

17   bring it to -- into the 14th District for us.

18       Q      Before she put it in her vehicle, what

19   happened to the videos that were on the floor that

20   you saw the defendant drop?

21       A      I retrieved those videos, and I just

22   placed them in the bag with the other videos.

23       Q      Did you notice any garbage in the bag

24   aside from all the videos?

1        A      None at all.

2        Q      Now, do you know where Jose Pagan is

3    today?

4        A      Currently?  Yes.  He moved to Florida.

5        MS. CALLAS:  Your Honor, may I approach?

6        THE COURT:  Yes.

7        MS. CALLAS:

8        Q      Officer, I'd like --

9        THE COURT:  Have you shown them to the

10   defendant?

11       MS. CALLAS:  He's got copies of them.

12       THE COURT:  The record will reflect the State

13   is showing those to defendant.

14       MS. CALLAS:

15       Q      I'd like to show you what's been marked

16   as People's Exhibit 1 for identification.  Do you

17   recognize what that's a photograph of?

18       A      Yes.  That's the window at the

19   Blockbuster.

20       Q      And does that show the window that's

21   broken?

22       A      Yes, it does.

23       Q      How many windows are broken?

24       A      Just one.

1        Q     I'd like to now show you what's been

2    marked as People's Exhibit 2.

3        A     It's the same photograph, just close up.

4        Q     Does that also show the broken window?

5        A     Yes.

6        Q     People's Exhibit 3, can you say what that

7    is a photograph of?

8        A     That's a sign for the Blockbuster at that

9    location.

10       Q     And do all these photos truly and

11   accurately depict how the windows and the

12   Blockbuster sign looked on February 25, 2004, at

13   approximately 4:30 in the morning?

14       A     Yes.

15       Q     With regards to the items that Officer

16   Lee puts -- the garbage bag full of the videos --

17       A     Uh-uhm.

18       Q     -- you said she put that in her squad

19   car?

20       A     Yes.

21       Q     Did you see that bag again?

22       A     Yes, I did.

23       Q     Where did you see it?

24       A     When we went into the station, Officer

1      Lee brought the bag and gave it to me.

2          Q    What did you do with the bag when she

3      gave it to you?

4          A    At that time, I inventoried the items,

5      taking them out of the garbage bag, and putting

6      them in that inventory bag right there.

7          Q    Now, when you say you inventoried the

8      items, did you place them in the evidence bag and

9      give them a unique inventory number?

10         A    Yes, I did.

11         Q    Was that inventory No. 10281365?

12         A    Yes.

13         Q    And did you heat seal the bag in your

14     presence?

15         A    Yes, I did.

16         Q    I'd like to show you what's been marked

17     as People's Group No. 4 for identification.  Do you

18     recognize this bag?

19         A    Yes, I do.

20         Q    And what is that bag?

21         A    This is the inventory bag that I put the

22     videos that we recovered in.

23         Q    And those are all the videos that were

24     recovered?

1        A    Yes, they were.

2        Q    From the ground as well as the garbage

3    can?

4        A    Correct.

5        Q    And is that heat sealed?

6        A    Yes, it is.

7        Q    I'm going to ask if you could please cut

8    that bag open?

9             For the record, the officer has now cut

10   the heat sealed back open.

11            And that contains the videos that you

12   recovered again?

13       A    Yes.

14   MS. CALLAS:  Give me that back.

15            At this time, I have nothing further from

16   this witness.

17   THE COURT:  Cross-examination.

18   THE DEFENDANT:  Yes.

19

20                   CROSS EXAMINATION

21                   BY THE DEFENDANT:

22       Q    Officer, how long have you been an

23   officer with the Chicago Police?

24       A    Approximately two and a half years.

1        Q      Two and a half years.  Now, during your

2    training at the academy --

3        A      Yes.

4        Q      -- there's an offense report filled out?

5        A      Correct.

6        Q      Correct?

7        A      Yes.

8        Q      Do you have a copy of that offense

9    report?

10       A      Not on me at this time.

11       Q      That's what you use on the streets when

12   crimes or something happen?

13       A      General case offense reports.

14       Q      Report.  Now, do you use that on the

15   street in case you see something, you write it down

16   to refresh your memory, is that correct, because

17   you're trained at the academy to do this, right?

18              When you pull up and you see something,

19   you write it down so you refresh your memory, is

20   that correct?

21       A      A report is needed, yes, sir.  We can do

22   it on scene.

23       Q      Isn't that required as a police officer?

24   You're trained as a police officer to do this in

1    case you see something, you write it down?

2        A    It's not required to do it on scene.    If

3    a report deems necessary, yes, we have to.

4        Q    But if something, like you giving a

5    person a ticket or something like that, and you

6    have this in the car with you, is that correct?

7        A    Yes, I have the reports.

8        Q    And you were trained at the academy to

9    have this arrest report offense report so when you

10   see something that's very important, you write it

11   down to refresh your memory?

12       A    You need to speak a little more for me.

13   Is the offense report the report or the arrest

14   report?  Which one are you talking about?

15       Q    Offense report, arrest report.  You use

16   this as a police officer?  You're trying to use

17   this?

18       A    An arrest report, we do not do on the

19   scene.

20       Q    You do not do on the scene?

21       A    No.

22       Q    You just think of something as a trained

23   police officer and just write anything down?

24   That's what they teach you at the academy?

1          MS. CALLAS:  Objection.

2          THE COURT:  Sustained.

3              Why don't you ask another question?

4          THE DEFENDANT:

5          Q    Do you have a copy of that offense arrest

6      report?

7          MS. CALLAS:  Objection.

8          THE COURT:  He can answer --

9          MS. CALLAS:  There are two separate things.

10         THE COURT:  -- if he understands the

11     question.

12         THE WITNESS:  Do you want a copy of the case

13     report, or do you want a copy of the arrest

14     report?

15         THE DEFENDANT:

16         Q    The offense arrest report.

17         A    I don't have one with me, but I'm sure

18     they can produce one for me.

19         THE DEFENDANT:  State, can you give him a

20     copy, please?

21         MS. CALLAS:  Objection.  No.

22         THE COURT:  What report are you --

23         THE DEFENDANT:  The offense arrest report that

24     you use on the streets.  It's required that you use

1    on the streets, you know, when you see something,

2    you write it down.

3        THE COURT:  Mr. Griffin, you can only ask one

4    question at a time.

5        THE DEFENDANT:  Yes, ma'am.

6        THE COURT:  If you ask a question, wait and

7    let him answer it.  You're asking about a string of

8    three or four questions.

9        THE DEFENDANT:

10       Q    The offense arrest report, do you have a

11   copy of it?

12       A    There's a general offense case report,

13   and then, there's an arrest report.  Those are two

14   different reports.

15       Q    And they happen to bear your signature,

16   is that correct, and star number, the date and time

17   that you see something --

18       A    Yes.

19       Q    -- is that correct?  What I want to show

20   you is --

21       THE COURT:  Mr. Griffin, if you want to show

22   an exhibit, you're going to hand it to the deputy.

23       THE DEFENDANT:  Deputy, could you hand him

24   these copies?

1          THE COURT:  And you mark that as an exhibit,
2     sir.
3          THE DEFENDANT:  Exhibits 5, 6 and 7, what the
4     State's Attorney gave to me.
5          THE COURT:  Show it to the State.  What
6     exhibit number is it marked as, sir?
7          THE DEFENDANT:  5, 6, and 7, five pages of
8     what they gave to me.
9          MS. CALLAS:  For the record, it's a five page
10    Chicago Police Department arrest report.
11         THE COURT:  Is it marked as Defendant's
12    Exhibit No. 1?
13         THE DEFENDANT:  No. 1.
14         THE COURT:  It can be marked as Defendant's
15    Exhibit No. 1.  Mark it as Defendant's Exhibit No.
16    1.
17         THE DEFENDANT:  Yes.
18         THE COURT:  Hand it to the deputy.  It
19    consists of five pages, and it can be shown to the
20    witness.  The record will reflect that the exhibit
21    has been tendered to the witness.
22         THE DEFENDANT:
23         Q    That's your arrest report, is that
24    correct?

1       A    This is the arrest report, yes, sir.

2       Q    And that's what you use on the street, is

3    that correct?

4       A    No, sir.

5       Q    That's not the one you use on the street?

6       A    No.

7       Q    Well, what happened to the one you use on

8    the street, sir?

9       A    I didn't do a report on the street, but

10   you're talking about the general offense case

11   report.

12      Q    Yes.

13      A    Yes, sir.

14      Q    You didn't do a report?

15      A    Yes, we did.

16      Q    Where is that report?

17      A    There's copies of it, I'm sure.  I'm sure

18   you have a copy of it, as I'm sure the State does,

19   also.

20      THE COURT:  State, why don't you provide a

21   copy of the report?  It's been tendered.

22      MS. CALLAS:  There's an extra copy.  I'll give

23   you an extra copy.

24      THE COURT:  The record will reflect the State

1    has tendered a two page document.

2         MS. CALLAS:  Correct.  It's redacted.

3         THE COURT:  If you want to use it as an

4    exhibit, mark it as Defendant's exhibit.

5         THE DEFENDANT:  Defendant's Exhibit No. B.

6         THE COURT:  The defendant's exhibit consists

7    of a two page document, and if you'll hand it to

8    the deputy who will hand it to the witness,

9    please.

10        THE DEFENDANT:

11        Q    Is that your offense arrest report?

12        A    This is the general offense case report.

13        Q    Does it happen to bear your signature?

14        A    No, it does not.

15        Q    Does it happen to bear your star number?

16        A    No, it does not.

17        Q    And it's required that you have this on

18   the street so when you see something, you write it

19   down, isn't it correct, sir?

20        A    Correct.

21        Q    So, where is that offense arrest report

22   with your signature and your star number on it,

23   sir?

24        A    This is the other officers that were on

1  scene.  That's their signatures at the bottom.

2      Q    You was one of the arresting officers, is

3  that correct?

4      A    Yes, I was.

5      Q    So, you was on the scene, is that

6  correct?

7      A    Yes, I was.

8      Q    So, you're lying then, is that correct?

9      MS. CALLAS:  Objection.

10     THE COURT:  Sustained.  Why don't you ask

11 another question?

12     THE DEFENDANT:

13     Q    Does any one of those arrest reports

14 happen to bear your signature, sir?

15     A    Yes, it does.  On -- let's see.  I

16 believe it's page 3, where it says arresting

17 officers.  It says the first arresting officer, and

18 there's my name and star number.

19     Q    So, your signature, handwritten

20 signature?

21     A    This report does not require a

22 signature.  It's an electronic signature.

23     Q    It's electronic from a typewriter?

24     A    No.

1        Q     From Area 5 District, right?

2        A     From the 14th District, yes.

3        Q     The 14th District?

4        A     Yes.

5        Q     But doesn't it say Area 5 at the top,

6    sir, generated from a computer, sir?

7        A     Yes.

8        Q     So, you're lying?

9        MS. CALLAS:  Objection.

10       THE COURT:  Sustained.

11       THE DEFENDANT:

12       Q     So, you don't know exactly -- you don't

13   know what happened.  You never saw anything on that

14   day without your offense arrest report, do you,

15   sir?  You are under oath, Officer.  What I have in

16   my possession --

17       THE COURT:  You're asking about ten questions.

18       THE DEFENDANT:

19       Q     -- the arrest report --

20       THE COURT:  Mr. Griffin.

21       THE DEFENDANT:

22       Q     So, when you see something, the relevance

23   of this is, this is --

24       THE COURT:  Mr. Griffin, you can ask all the

1    questions you want, but you have to ask them one at

2    a time.

3         THE DEFENDANT:  I'm asking one at a time.

4         THE COURT:  You asked about ten questions.

5         THE DEFENDANT:

6         Q    This is concerning his arrest report that

7    you use on the streets when you see something?

8         A    Excuse me?

9         Q    Your offense arrest report?

10        A    What about it?

11        Q    When you see something on the street that

12   happens --

13        A    Could you please refer to it as an arrest

14   report and offense case report, please, because

15   there are two reports.

16        Q    Neither one of those happen to bear your

17   signature, does it, sir?

18        A    This one does, yes.

19        Q    Could you show me where it bears your

20   signature?

21        A    First arresting officer, Star No. 15875,

22   Blomstrand, MPCOW 560.  That is my computer

23   generated code.

24        Q    That's there at the police station?

```
1          A     Yes.

2          Q     That wasn't there on the streets while

3    you were on the streets?

4          A     No, it was not.

5          Q     So, you're lying?

6          MS. CALLAS:  Objection.

7          THE COURT:  Sustained.

8          THE DEFENDANT:

9          Q     Am I correct?

10         THE COURT:  Ask another question, please.

11         THE DEFENDANT:  Your Honor, what I have in my

12   possession is an offense arrest report that the

13   Chicago Police uses on the streets.

14         MS. SCHULTZ:  Can I see the document, please?

15         MS. CALLAS:  I have not seen it.

16         THE DEFENDANT:  Thank God that I happen to --

17         MS. CALLAS:  Objection to the continuing

18   commentary.

19         THE COURT:  Mr. Griffin, show the document.

20         THE DEFENDANT:  -- be in possession of this.

21         THE COURT:  Are you intending to use that as

22   an exhibit, sir?

23         THE DEFENDANT:  Exhibit 3B.

24         THE COURT:  Defendant's Exhibit No. 3.  You
```

1    don't need the B, sir.

2        THE DEFENDANT:  I would like to tender this to

3    the officer.

4        THE COURT:  The record will reflect that the

5    witness has been handed, through the deputy,

6    Defendant's Exhibit No. 3.

7        THE DEFENDANT:

8        Q    That is an offense arrest report that's

9    used on the streets, isn't it, sir?

10       A    Arrest reports are not done on the

11   street; but yes, this is an arrest report.

12       Q    That's just like the one you use on the

13   streets.  You write down something you see?

14       A    Yes.  This is an old arrest report.

15       Q    That's an older one.  How old is that

16   one?

17       A    The date on this one is 2004.

18       Q    2004?

19       A    Yes.

20       Q    So, this one here and the time of the

21   crime happened in 2004, is that correct?

22       A    Yes.

23       Q    So, they was still in effect, is that

24   correct?

1          A    Yes.

2          THE DEFENDANT:  No further questions, your

3    Honor.

4          THE COURT:  Sir, let the deputy hand you the

5    exhibit.

6          MS. CALLAS:  Actually, Judge, can I see that

7    exhibit, please?

8          THE COURT:  Yes.  Redirect.

9

10                        REDIRECT EXAMINATION

11                        BY MS. CALLAS:

12         Q    Officer, every time an arrest is made, a

13    police report is generated, correct?

14         A    Correct.

15         Q    That's what's called a general offense

16    case report?

17         A    Yes.

18         Q    That's this two page document, is that

19    correct?

20         A    Yes, ma'am, it is.

21         Q    In this case, this document was not

22    filled out by you, isn't that correct?

23         A    Correct.

24         Q    Your name is on it?

1        A    Yes, ma'am, it is.

2        Q    Officer Lee and Pargoni, they're the ones

3    that filled out the report?

4        A    Yes.

5        Q    That's general.  Some will fill out one

6    report, some the other, or some none?

7        A    Yes.

8        Q    With regards to the arrest report that

9    was handed to you, this five page, this is computer

10   generated, is it not?

11       A    Yes, ma'am, it is.

12       Q    So, there's no actual, physical

13   signature?  It's an electronic signature?

14       A    Yes.

15       Q    And that report was done by you and your

16   partner Officer Prill?

17       A    Yes, ma'am.

18       Q    This is from the 14th District, correct?

19       A    Yes.

20       THE COURT:  Reflecting which exhibit?

21       MS. CALLAS:  Defendant's Exhibit No. 1.

22       Q    With regards to Defendant's Exhibit No.

23   3, what district is this arrest report from?

24       A    7th District, I believe.

1      Q    The 7th district is not the 14th

2  District, isn't that correct?

3      A    Correct.

4      Q    Do you know whether or not the Chicago

5  Police Department was currently in the process from

6  moving from this old arrest report to this new

7  computerized arrest report?

8      A    Yes.

9      Q    Some police districts still use the old

10 reports because they don't --

11     A    Actually, the majority of the districts

12 still use the hard copy of a case report, and

13 they're in the process of changing it all to

14 electronic computer style.

15     Q    So, if someone were arrested today in a

16 certain district, they could still have this one

17 page arrest report?

18     A    Yes.

19     Q    But in the 14th District, they're going

20 to get five pages?

21     A    Yes.

22     Q    It's normal that they would be different

23 in different places?

24     A    Yes.

1          THE COURT:  Anything further?  That's all the

2     questions the State has at this time?

3          MS. CALLAS:  That's all.

4          THE COURT:  Any further questions?

5          THE DEFENDANT:  Yes, your Honor.

6

7                         RECROSS EXAMINATION

8                         BY THE DEFENDANT:

9          Q     Officer, you never appeared before Judge

10    Gerald T. Wienicki concerning this matter on

11    February the 27th, 2004, did you, sir?

12         A     No, I did not.

13         Q     But you was aware that a preliminary

14    hearing took place concerning this case?

15         A     Did it take place here?

16         Q     No.  At the 15th District -- 25th

17    District, Grand and Central?

18         A     Oh, at Grand and Central.

19         Q     Yes.

20         A     I was at that hearing.  Yes, I was.

21         Q     And you never gave Judge Gerald T.

22    Wienicki statements concerning --

23         A     Are you referring to Judge Wienicki?

24         Q     Yes.  You never gave him any statements

1    concerning this case, did you, sir?

2         MS. CALLAS:  Objection, relevance.

3         THE COURT:  He can answer.

4         THE WITNESS:

5         A    No, I did not.

6         THE DEFENDANT:

7         Q    Could you tell the ladies and gentleman

8    of the jury why didn't you give statements to Judge

9    T. Wienicki when you was in this courtroom

10   concerning this case?

11        A    Because at that time, it was just a

12   probable cause hearing to determine whether there

13   was probable cause to arrest you.  After talking to

14   the witness and after talking to the manger of

15   Blockbuster, the Judge ruled that there was

16   probable cause and didn't need to talk to me.

17        Q    He didn't need to talk to you?

18        A    He didn't need my testimony at that

19   point.

20        Q    He didn't need to talk to you, and you

21   didn't need to give statements concerning this

22   case?

23        A    No.

24        Q    That's what he told you, or that's what

1    you're saying?

2        A    The State's Attorney came into the
3    separate room where they held me so, I didn't hear
4    the other testimony, and told me that there was
5    probable cause.

6        Q    Right.  Now, the State showed you the
7    window that was broken.  Do you know what caused
8    that window to become broken?

9        A    No, I did do not.

10       Q    Did you see who broke this window?

11       A    No, I did not.

12       Q    Was any evidence recovered that broke
13   this window?

14       A    Not that I know of.

15       Q    Was any fingerprints taken of this place?

16       A    No, not that I know of.

17       Q    Now, you stated that you observed tapes
18   being dropped, is that correct?

19       A    Correct.

20       Q    Now, in crimes like this here, you get
21   evidence and if you see somebody with something,
22   right, you get it, and then you take it to the lab,
23   and then you analyze it, and then you take
24   fingerprints, is that correct?

1        A     Depending on the crime, yes.

2        Q     No.  Depending on all crimes, if you got

3    a crime scene, that's what you do so you can prove

4    that this person is the right person that we got,

5    is that correct?

6        A     Like I said, depends, for example, on the

7    crime, yes.

8        Q     But you're trained to do this from the

9    academy?

10       A     I'm trained to recover property that's

11   been stolen and so forth, and inventory it.

12       Q     That was stolen.  That's taken from

13   something, and that's recovered.  Do you, and are

14   you required, to analyze and take fingerprints,

15   say, like the video tapes?

16       A     Um-uhm.

17       Q     Were fingerprints taken from those video

18   tapes?

19       A     No, they were not.

20       Q     You were trained to do this?

21       A     I was never trained to take fingerprints,

22   no.

23       Q     But was a technician called?

24       A     Yes.  There was an evidence technician

1    called to the scene, yes.

2         Q    And were fingerprints taken?

3         A    No.

4         Q    They were -- no fingerprints was never

5    taken?

6         A    No.

7         Q    But you observed someone dropping --

8         A    I observed you dropping the tapes.

9         Q    You observed me dropping the tapes?

10        A    Yes.

11        Q    To prove what you were saying, if I had

12   my hands on any one of those tapes, fingerprints of

13   mine were on those tapes.  Were they lifted off

14   those tapes?

15        A    It wouldn't be reasonable to take

16   fingerprints.  How many people have handled those

17   tapes and how many different fingerprints would

18   come off those tapes, it wouldn't be reasonable to

19   do such a thing.

20        Q    But now, during that night, you say 4:30

21   in the morning?

22        A    Uh-uhm.

23        Q    There wasn't no one out there but me,

24   correct?

1     A    Correct.

2     Q    You observed me dropping tapes?

3     A    Yes.

4     Q    And you picked this evidence, you got the

5 right man?

6     A    Uh-uhm.

7     Q    So, the tapes I had that you lift

8 fingerprints off of to prove what you're saying is

9 true?

10    MS. CALLAS:  Objection, asked and answered.

11    THE COURT:  It's already been --

12    THE DEFENDANT:

13     Q    You say I dropped two tapes?

14     A    The amount I don't have, but there were

15 several.

16     Q    If you had arrest reports, you write down

17 everything, and then you read --

18     A    I don't remember anything or --

19     Q    You don't remember anything, do you,

20 Officer?

21     A    How many you dropped?  Are you asking me

22 how many you dropped?  Is that what you want me to

23 say?

24     Q    Yes.

1          A     It was between five and ten.

2          Q     And where did I drop them, my left hand,

3     right hand?

4          A     Both hands.

5          Q     Could you stand up and show the ladies

6     and gentlemen how I did this?  Please, could you

7     show them how this was did this morning?

8          A     Yeah.

9          Q     How I was carrying it.

10          A     I saw you standing there, and you had

11     them clunched up to your chest, and a bunch of them

12     like this.  You looked towards my direction.  You

13     saw that I was there, and you dropped them, and

14     started to walk away.

15          Q     And I started to walk away?

16          A     Yes.

17          Q     At that point in time when you observed

18     the subject allegedly say drop them, if I had

19     anything in my possession that belonged to

20     Blockbuster, my fingerprints would be on it, is

21     that correct?

22          A     Among the other millions of fingerprints

23     that are on them already, probably.

24          Q     You recovered the ones that I dropped, is

1    that correct?

2        A    Yes, I did.

3        Q    Right their on the crime scene.  And how

4    far away were you when you observed me dropping

5    some tapes?  Were you in your car, or were you

6    walking?

7        A    I was in the car.

8        Q    Aunt how far away were you, sir?

9        A    Approximately 20 to 30 feet.

10       Q    And it was dark outside?

11       A    No.  It was lighted.  It was a lighted

12   parking lot.

13       Q    It was 4:30 in the morning, and it was

14   dark outside?

15       A    Yes, but --

16       Q    And you were in your car.  Which way were

17   you headed, east, west?

18       A    I was facing west.

19       Q    In the vehicle?

20       A    In the vehicle.

21       Q    On what street were you on, sir?

22       A    We were in the parking lot.

23       Q    The parking lot?

24       A    Yes.

1      Q      You were headed west in the parking lot?

2      A      Uh-uhm.

3      Q      Which way did you enter the parking lot?

4      A      We entered in the east.

5      Q      From the east?

6      A      Off of Ashland.

7      Q      What street is that?

8      A      Off of Ashland.

9      Q      You pulled in off of Ashland?

10     A      Correct.

11     Q      This place is a mall, is that correct?
12  So, that means you had to come all the way from
13  Ashland and pull all the way around, and received a
14  call, is that correct?

15     A      Correct.

16     Q      And the person you received the call,
17  he's in Florida?

18     A      Correct.

19     Q      He left and went to Florida.  An
20  important case like here, he went to Florida?

21     A      I don't know why he moved to Florida.

22     Q      Jose Pagan, is that correct, because he
23  gave statements at the preliminary hearing before
24  Judge Gerald T. Wienicki, February 27, 2004.  You

1    remember, is that correct, because you was at the

2    proceedings?

3        A    I didn't hear his testimony, no.    I

4    wasn't allowed to hear it.

5        Q    But the tapes what we're talking about

6    what you're saying is true, if I had those tapes,

7    my fingerprints would be lifted off those tapes?

8        MS. CALLAS:  Objection.

9        THE COURT:  Sustained.

10        THE DEFENDANT:

11        Q    Am I correct?

12        MS. CALLAS:  Objection.

13        THE COURT:  Objection sustained.  Ask another

14    question, sir.

15        THE DEFENDANT:  No further questions, your

16    Honor.

17        THE COURT:  State have any additional

18    questions of this witness?

19        MS. CALLAS:  Brief redirect.

20

21                    FURTHER REDIRECT EXAMINATION

22                    BY MS. CALLAS:

23        Q    Prior to the time that you arrested this

24    defendant, did you know him?

1          A    No.

2          Q    Did you have anything against him?

3          A    No.

4     MS. CALLAS:  Nothing further.

5     THE COURT:  Anything further?

6     THE DEFENDANT:  One further thing.

7     THE COURT:  Based on that?

8     THE DEFENDANT:  Yes.

9

10                    FURTHER RECROSS EXAMINATION

11                    BY THE DEFENDANT:

12         Q    Officer, did you observe me take anything

13    out of Blockbuster on that day?

14         A    No, I did not.

15         Q    You just seen me walking away from

16    Blockbuster?

17         A    With Blockbuster property.

18         Q    With Blockbuster property.  And you were

19    in your car driving, and you were 20 feet away, and

20    it was dark outside?

21         A    I was the passenger, sir.

22         Q    You was the passenger, and you was coming

23    west off of Ashland?

24         A    Correct.

1        Q    Correct?  But now, this Blockbuster is

2    kitty-corner, it's like inside a mall, is that

3    correct?

4        A    Yes.

5        Q    It would be impossible for you to come

6    there, within coming back west inside this mall,

7    and you're heading east, isn't that correct,

8    Officer?

9        A    I was headed west.

10       Q    You were headed west?

11       A    Yes.

12       Q    Coming from east?

13       A    Oh, yeah.  I came off of Ashland from

14   east, right.

15       Q    You came off of Ashland.  That's east?

16       A    Yes.

17       Q    And you headed west?

18       A    Yeah.

19       Q    Towards Damen.  So, now you're inside the

20   mall?

21       A    Uh-uhm.

22       Q    And you're coming across, and how far

23   Blockbuster is from Ashland?

24       A    Maybe half a block.

```
 1        Q      Half a block?

 2        A      Yeah.  It's a fairly large strip mall,

 3    yes.

 4        Q      Is it approximately maybe two or three

 5    blocks?

 6        A      I wouldn't say that big, but --

 7        Q      So, is the time you entered the lot,

 8    that's when you observed me, is that correct?

 9        A      No.  I didn't observe you until I pulled

10    up to the Blockbuster.

11        Q      Until you pulled up to the Blockbuster?

12        A      Correct.

13        Q      Correct.  And you received a call that a

14    burglary was in progress?

15        A      Yes.

16        Q      And the person you received it from would

17    be Jose Pagan?

18        A      Yes.

19        Q      And he's not here today.  Is he here?

20        A      No, he's not.

21        Q      He left and went to Florida?

22        A      Yes; that's correct.

23        Q      On an important case as this?

24        MS. CALLAS:  Objection.
```

1          THE COURT:  Sustained.

2          THE DEFENDANT:

3          Q    Is that correct, Officer?

4          THE COURT:  Objection sustained.  Ask another

5     question, sir.

6          THE DEFENDANT:  No further questions, your

7     Honor.

8          MS. CALLAS:  Nothing further.

9          THE COURT:  Thank you.

10                    (Witness excused.)

11         THE COURT:  State may call their next witness.

12         MS. CALLAS:  People call Officer Lee.

13                    (Witness sworn.)

14

15                    OFFICER ALYSE LEE,

16     A witness called on behalf of the People of the

17     State of Illinois, having been first duly sworn,

18     was examined and testified as follows:

19                    DIRECT EXAMINATION

20                    BY MS. CALLAS:

21         Q    Officer, could you please introduce

22     yourself to the ladies and gentlemen of the jury,

23     and give your star number?

24         A    Officer Alyce Lee, last name L-e-e, Star

1    No. 19888.

2        Q    And what is your current unit of

3    assignment?

4        A    14th District.

5        Q    And you're a Chicago Police Officer, is

6    that correct?

7        A    Yes, ma'am.

8        Q    How long have you been a Chicago Police

9    Officer for?

10       A    Nine and a half years.

11       Q    Directing your attention to February 21,

12   2004, at approximately 4:30 a.m., were you working

13   at that time?

14       A    Yes.

15       Q    And were you working alone or with a

16   partner?

17       A    With a partner.

18       Q    What is your partner's name?

19       A    Officer Rick Pargoni.

20       Q    And were you in full uniform as you are

21   today?

22       A    Yes.

23       Q    And were you in a vehicle?

24       A    Yes.

1        Q     What kind of vehicle?

2        A     A marked squad car.

3        Q     Is that a regular Chicago Police car with

4    the lights on top?

5        A     Yes.

6        Q     Did you go and your partner go to 1303

7    North Milwaukee Avenue on that date and time in

8    Chicago, Cook County, Illinois?

9        A     Yes.

10       Q     When you got to that location, did you

11   see anyone that you see here in court today?

12       A     Yes.

13       Q     Can you please point out the person that

14   you saw, an article of clothing the person is

15   wearing?

16       A     There, Dwayne Griffin.  He's wearing a

17   beige top.

18       MS. CALLAS:  I'd ask the record reflect the

19   in-court identification of the defendant.

20       THE COURT:  Yes.

21       MS. CALLAS:

22       Q     Where did you see the defendant?

23       A     At the Blockbuster at that location.

24       Q     Who was he with?

1       A       He was with Officer Matt Blomstrand.

2       Q       Anyone else?

3       A       And his partner Joseph Prill.

4       Q       Was he in custody at that point?

5       A       Yes, ma'am, he was.

6       Q       He had already been arrested?

7       A       Yes.

8       Q       Were you and your partner and the other

9  officer approached by an individual by the name of

10  Jose Pagan at that time?

11      A       Yes.

12      Q       Did Jose Pagan have a conversation with

13  all of you?

14      A       Yes.

15      Q       After that conversation, did you go

16  anywhere?

17      A       Yes.

18      Q       Where'd you go?

19      A       I walked approximately 200, 250 feet away

20  from the original spot where we were standing at

21  that time to a garbage can.

22      Q       Can you describe the garbage can?

23      A       The garbage can is a wire basket that has

24  a lid to it that is a hole to receive garbage

1    items.

2        Q    Was there a plastic bag in there?

3        A    Yes.

4        Q    When you went over to the garbage can,

5    what did you find?

6        A    I found a garbage bag inside containing

7    various cassette tapes and --

8        Q    Was there any indicia on the -- at the

9    same time who they belonged to?

10       A    Yes, there was.

11       Q    Who was that?

12       A    Blockbuster.

13       Q    And after you recovered these items, did

14   you take the garbage bag out?

15       A    Yes.

16       Q    Where did you go with that?

17       A    I walked back over to Officer

18   Blomstrand.

19       Q    And then, what happened?

20       A    He placed inside the garbage bag that I

21   already had more DVDs and video cassettes tapes.

22       Q    And did he say where he recovered those,

23   where he got those?

24       A    Yes.

1          Q      From where?

2          A      From the ground where Mr. Dwayne Griffin

3    was arrested.

4          Q      Was there a window nearby?

5          A      Yes.

6          Q      How far was the window?

7          A      Just on the ground beneath.

8          Q      Just beneath.  What were the conditions

9    of those windows, if anything?  Did you notice?

10         A      There was one window broken.

11         Q      After you took that bag -- I'm sorry.

12    After Officer Blomstrand put the additional DVDs

13    and videos in the bag, what did you see with that?

14         A      I brought that garbage bag with DVDs and

15    cassettes back to my vehicle, yes.

16         Q      And did you transport it anywhere?

17         A      Yes, back to the 14th District.

18         Q      What did you do with them at the 14th

19    District?

20         A      I turned them over to Officer Blomstrand.

21         Q      Did you see what he did with them?

22         A      He inventoried those items.

23         Q      Did you see him put them in an evidence

24    bag?

1          A     Yes, I did.

2          MS. CALLAS:  May I approach, your Honor?

3          THE COURT:  Yes.

4          MS. CALLAS:

5          Q     I ask you to look at what's been marked

6     People's Exhibit No. 1.  Do you recognize that?

7          A     Yes.

8          Q     What is that?

9          A     It's a broken window out of many sets of

10    windows of Blockbuster.

11         Q     And I'd like you to look at what's been

12    marked as People's Exhibit 2.  Do you recognize

13    what that is?

14         A     It's a closer picture of the same window.

15         Q     And I'd like to show you what's been

16    marked as People's Exhibit 3.  Do you recognize

17    that, of what that's a photograph of?

18         A     Yes.  It's the Blockbuster sign above

19    those windows.

20         Q     Do 1 through 3 show how it looked on

21    February 21, 2004?

22         A     Yes, they do.

23         Q     I'd like to now show you what's been

24    marked People's Group No. 4.  Do you recognize all

1    of the items in this bag?

2        A    Yes, ma'am.

3        Q    And what are items in this bag?

4        A    Those are the various DVD cases, VHS

5    tapes that I recovered from the garbage can.

6        Q    Does that include the items Officer

7    Blomstrand put in the bag underneath the window at

8    Blockbuster?

9        A    Yes, ma'am, it does.

10        Q    These are the items you transported back

11    in the district?

12        A    Yes.

13        Q    Are they substantially in the same

14    condition as when they were recovered?

15        A    Yes, they are.

16        MS. CALLAS:  Nothing further, your Honor.

17        THE COURT:  Cross-examination.

18        THE DEFENDANT:  Yes.

19

20                    CROSS EXAMINATION

21                    BY THE DEFENDANT:

22        Q    Officer Lee, how long have you been an

23    officer?

24        A    Nine and a half years.

1      Q    Nine and a half years.  Now, during your

2   nine and a half years as a police officer, there's

3   an offense arrest report made out?

4      A    Yes.

5      Q    Is that correct?

6      A    Yes.

7      Q    This is not the offense arrest report, is

8   it, ma'am?

9      A    No, sir.

10      Q    Because it happens to bear officers'

11   signatures and star numbers and the date and time

12   that they observed something happen.  You know,

13   when they see something, is that correct?

14      A    I'm not sure I understand your question.

15      Q    The offense arrest report is used to --

16   when someone is arrested, this is what they're

17   charged with, is that correct?

18      A    Yes, sir.  That's one form.

19      Q    That's one form.  Now, on this date and

20   time, did you see who broke that window?

21      A    No.

22      Q    Do you know what caused that window to

23   become broke?

24      A    No.

1       Q    Do you know when that window became

2   broken?

3       A    No.

4       Q    Was any evidence recovered that could

5   have broken that window?

6       A    No, sir.

7       Q    You never saw me with any of the tapes

8   that the State was showing you, did you, ma'am?

9       A    You with them?  No.

10      Q    And you never saw me take anything out of

11  Blockbuster that day, did you, ma'am?

12      A    No.

13      Q    And this arrest report that I have here,

14  and it has --

15      MS. SCHULTZ:  What?

16      MS. CALLAS:  For the record, what exhibit

17  number?

18      THE DEFENDANT:  2B.

19      MS. CALLAS:  For the record, he's showing her

20  the general offense case report which is not the

21  arrest report, and that's Defendant's Exhibit 2.

22      THE DEFENDANT:

23      Q    But it happens to bear 19888.  That's

24  you, and you filled this out, is that correct?

1        A     Yes, sir.

2        THE DEFENDANT:  Okay.  Your Honor, I would

3    like to give this to her.

4        THE COURT:  Hand that to the deputy.

5            The record will reflect you're handing

6    what you previously marked as Defendant's Exhibit

7    No. 2, a two page document, is that correct?

8        THE DEFENDANT:  Yes.

9        Q     Could you read the bottom of it to the

10   ladies and gentlemen of the jury, please?

11       A     What part of the bottom?

12       Q     The writing down where your name?

13       A     You just want my name?

14       Q     No.  No.  No.  Where the person is given

15   statements?

16       MS. CALLAS:  Objection.

17       THE COURT:  Sustained.

18       THE DEFENDANT:

19       Q     Where the statement is given.

20       THE COURT:  That's an improper question.  She

21   can't just read statements from the arrest report.

22   You can ask a question though concerning that.

23       THE DEFENDANT:

24       Q     That general offense arrest report, you

1      filled it out, is that correct?

2          A    Yes.

3          Q    Could you read it to the ladies and

4      gentlemens of the jury?  What does it state on

5      there because you filled that out during that

6      process?

7          THE COURT:  You're withdrawing your

8      objection?

9          MS. CALLAS:  Yes.

10         THE COURT:  Okay.

11         THE WITNESS:

12         A    In summary, above offender -- witness

13     states that while walking northbound Milwaukee, the

14     rear of 1303 Milwaukee, witness heard glass break.

15     Witness states he observed the offender reach his

16     hands into the broken window removing property as

17     witness stood at the gate, the through passage from

18     Milwaukee to the parking lot and business

19     entrance.

20              Witness observed offender remove

21     property, then walk around the front of the

22     building to the garbage can, then throwing the

23     property into the can.  Witnesses observed offender

24     then return to the broken window.  14343, first on

1    scene, observed the offender drop property, then

2    walk, and 14343 placed in custody.  RO recovered

3    copies from the trash can, and RO ordered ET for

4    photos of the broken window approximately 12 by

5    12.  Offender Mirandized, transported to 14th

6    District.

7         THE DEFENDANT:

8         Q    And the person that gave you the

9    information, his name is?

10        A    Jose Pagan.

11        Q    Do you see that person in the courtroom

12   today?

13        A    No, I don't.

14        Q    Do you know where that person is?

15        A    No, I don't.

16        Q    You don't know.  Well, the other officer

17   gave testimony that somehow, he left and went to

18   Florida on an important crime as this?

19        A    I don't know.

20        Q    Well, you never appeared before Judge

21   Gerald T. Wienicki, did you, ma'am?

22        A    Pardon me?

23        Q    Judge Gerald T. Wienicki?

24        A    No.

1          Q    Concerning this case, you never appeared

2    before him?

3          A    No, I didn't.

4          Q    Right, and your offense arrest report,

5    you never filled that out?  You didn't fill one

6    out?

7          A    The arrest report?

8          Q    Right.

9          A    No.

10         Q    Because you came on the scene a little

11   later after everything had happened, is that

12   correct?

13         A    Yes.

14         Q    But you did take this statement from

15   Jose?

16         A    Yes.

17         Q    Yes.  And Jose is not here?

18         A    No.

19         THE DEFENDANT:  No further questions, your

20   Honor.

21         THE COURT:  Okay.  Thank you.

22              State?

23         THE DEFENDANT:  I would like to have the copy

24   back.

1          THE COURT:  The deputy will take that and hand

2     it back.

3               State, do you have any further questions

4     of this witness?

5          MS. CALLAS:  No, Judge.

6          THE COURT:  Okay.  Thank you.

7                         (Witness excused.)

8          THE COURT:  State may call their next

9     witness.

10         MS. SCHULTZ:  People are calling Yvette

11    Nueva.

12                        (Witness sworn.)

13

14                    YVETTE NUEVA,

15    A witness called on behalf of the People of the

16    State of Illinois, having been first duly sworn,

17    was examined and testified as follows:

18                    DIRECT EXAMINATION

19                    BY MS. SCHULTZ:

20         Q    Good afternoon.  Please state your name,

21    and spell your last name for the court reporter.

22         A    Sure.  Yvette Nueva, N-u-e-v-a.

23         Q    And how are you currently employed?

24         A    I work as an inside sales rep at ITE

1    Distributing.  They're a wholesaler of office

2    machines and supplies.

3         Q    Calling your attention to February 21st

4    of 2004, where were you employed?

5         A    I was at Blockbuster Video.  I was the

6    store manager at 1303 North Milwaukee.

7         Q    On February 21, 2004, how long had you

8    been so employed at that Blockbuster?

9         A    At that location, since March of the

10    prior year.

11        Q    March of 2003?

12        A    2003, correct.

13        Q    And you were the store manager?

14        A    Yes, I was.

15        Q    What are the duties and responsibilities

16    of a store manager?

17        A    Interviewing, hiring, all retail

18    responsibilities, such as taking inventory,

19    assisting customers with situations, closing out

20    the store, monetary transactions, et cetera.

21        Q    Were you working on February 20, 2004,

22    into the early morning of February 21, 2004?

23        A    Yes, I was.  I was the closing manager

24    for that night from 5:00 p.m. until the store

1    closed which is 1:00 a.m.. And then we, of course,

2    have to stay there and clean up. And so, I left

3    the premises probably like 1:20, 1:30.

4        Q    So, you closed the store up, is that

5    correct?

6        A    Yes, I did.

7        Q    Prior to that, you said you did

8    inventory. What does that entail?

9        A    Inventory entails scanning each movie in

10   the store. I had done it a month prior. We are to

11   do it every month. It entails scanning every

12   single product that's in the store for rental as

13   well as for sale, and, you know -- well, of course,

14   it's a computer generated report that also the

15   corporation gets as well.

16       Q    So, you did all that prior to leaving the

17   store, correct?

18       A    Yes.

19       Q    And when you left the store, you locked

20   the doors?

21       A    Yes, of course.

22       Q    And when you left the store at that time,

23   describe -- are there windows at this store?

24       A    Yes, there are windows. There's several

1    windows right behind shelving units as well as in

2    the front of the store.

3        Q    And did you check to see whether any of

4    those windows were broken at that time?

5        A    No windows were broken because I, myself,

6    did the straightening in the store which means we

7    have to make sure the correct movies are behind

8    boxes or the movies are there, just make it look

9    neat and straight.

10        Q    So, you left about 1:30 in the morning?

11        A    Yes.

12        Q    When you left, you locked the door, and

13    you checked the windows, and you secured the

14    building?

15        A    Yes, I did.

16        Q    Did you later return back to the building

17    at about 6:00 o'clock in the morning?

18        A    Yes, I did.

19        Q    When you returned, what did you find at

20    the Blockbuster?

21        A    The window was broken, and there was a

22    police officer in the squad car.

23        Q    Where were the police?

24        A    In front of the window that was broken of

1    the store.

2         Q    I'd like to show you People's Exhibit No.

3    1 for identification.

4              You've seen these, right?

5         THE DEFENDANT:  Yes.

6         MS. SCHULTZ:

7         Q    Would you please identify People's

8    Exhibit 1 for identification?

9         A    Yeah.  This is the window on the side of

10   the store, and there's the broken window right

11   there.

12        Q    Describe how many panes of windows there

13   are.

14        A    Fifteen.

15        Q    And describe the glass that was on

16   windows on February 21st of last year.

17        A    Okay.  Well, there's a glass that's, of

18   course, normally clear, and then, there's a film

19   that was placed on it due to the sunshine coming in

20   and effecting the video tapes because the tapes

21   were getting damaged.

22              So, what they did, they placed a film on

23   top of each of the windows, and then this window

24   apparently must have been broken at some point in

```
1      time, not while I was there, but it was replaced

2      without the film.  The film was never --

3           Q    When you say this window, you're pointing

4      to?

5           A    This one right here.

6           Q    You're pointing to the bottom window all

7      the way to the left?

8           A    Yes.

9           Q    And the one next to it?

10          A    There is the broken window.

11          Q    I'd like to show you People's Exhibit No.

12     2 for identification.  What is that a photograph

13     of?

14          A    The same window.  It's just a more

15     enlarged image, and here you can see through the

16     window, the shelf, the units that stands right in

17     front of the windows, and you can even see, you

18     know, some movies here, like laid down.

19          Q    When you left the store, what were in

20     those shelves?

21          A    Movies.  That was -- the foreign section

22     was there.

23          Q    What type of movies?

24          A    Foreign movies.
```

1        Q    Was there DVDs?

2        A    It's a mix of DVD and VHS, mostly VHS,

3    because I had actually just included that category

4    into the store at that side of the store, what we

5    call the wall, and I had just placed those movies

6    there for better -- more visible for the customer.

7        Q    When you say you had just, that day, that

8    week?

9        A    That week, I had just moved that section

10   there.

11       Q    Had you viewed that section prior to

12   closing the store?

13       A    Yes, of course.  We have to view every

14   single section, like I said earlier, to make sure

15   the correct movies are behind the boxes and the

16   movies are lined up.  They look straight.  So, they

17   look fresh for the next opening day.

18       Q    Were all those shelves filled?

19       A    Yes, they were.

20       Q    And the glass all the way to the left?

21       A    Uh-uhm.

22       Q    The one that's clear, you said how long

23   had that window been in that condition?

24       A    Since I got there.

1       Q      And you've been there for a year?

2       A      Yes, uh-uhm.

3       Q      I'd like to show you People's Exhibit No.

4    3 for identification.  Do you recognize that?

5       A      Yes.  That's the Blockbuster sign.

6       Q      Where is that located?

7       A      At the top of the store all the -- around

8    all the way from the front of the store which is

9    inside the parking lot, all the way around to the

10   Milwaukee side of the store.

11      Q      Does People's Exhibit No. 1 and No. 2

12   accurately depict the picture of the window --

13      A      Yes.

14      Q      -- in Blockbuster on the date in

15   question?

16      A      Um-uhm.  Yes, they do.

17      MS. SCHULTZ:  Can I just have one second,

18   Judge?  May I ask that the identification be

19   stricken and the exhibits, Exhibits 1 and 2, be

20   tendered to the jury for them to look at?

21      THE COURT:  Admitted into evidence?

22      MS. SCHULTZ:  Yes.

23      THE COURT:  Any objection to the admission?

24      THE DEFENDANT:  No objection.

1        MS. SCHULTZ:  May the jury look at them?  May

2    I publish them?

3        THE COURT:  Yes, they can be published.  Pass

4    them through the jury at this time.  They will come

5    back to the jury room with you when you do

6    deliberate.

7             Any further questions of this witness?

8        MS. SCHULTZ:  Yes.

9        Q    I'd like to show you People's Exhibit --

10   Group Exhibit 4 for identification.  Do you

11   recognize what is in this clear evidence bag?

12       A    Blockbuster movies, VHS and DVD.

13       Q    Before we get into that, let me ask you.

14   Once you got back to the store --

15       A    Um-uhm.

16       Q    -- did you go into the store?

17       A    Yes, ma'am, I did.  I entered the store.

18       Q    What did you do?

19       A    I called my district leader, and I

20   informed him of what had happened as well as I went

21   to the area where it had happened, and I counted

22   all the missing spots where the movies were before,

23   and I counted how many were missing, and I counted

24   about 30.

1       Q     Did you do anything further?

2       A     Yes.   I had to wait there, and someone

3    came and gave me -- the police officers came and

4    gave me the report, and then I had to wait for the

5    window to be replaced.

6       Q     I'd like to show you these items.   I'm

7    going to put them in front of you to make it a

8    little easier.

9       A     Okay.

10      Q     Let me just take a few of these out.   How

11   do you recognize these as belonging to Blockbuster?

12      A     Not only do they have the Blockbuster

13   logo, but it also has the address on the corner in

14   the front and in the back of the tape itself to

15   what store it was pertaining to.   It tells you

16   right here, 1303 North Milwaukee, Milwaukee and

17   Paulina, which is the store, my store.

18      Q     Visually taking a look at these, do you

19   recognize the names of these videos?

20      A     Yeah.   They're all foreign movies like

21   this one is from, I think, Spain.   This one's from

22   Spain.   This was from China or something.   They're

23   all foreign movies.   It also tells you on the spine

24   the category, drama, foreign, and it tells you

1    subtitled which means it's in a different language,

2    and they're subtitled in English, and these are

3    cover boxes.

4        Q    What is a cover box?

5        A    A cover box is just the original

6    container that the movies came in, but we don't put

7    anything inside of them.  They're just to hold the

8    place of movies.  And what we do is, we place the

9    rental item right behind them.  So, when a customer

10   shops, let's say they want this movie, all they

11   would do is bring this up to the counter, and this

12   contains, like I said, the information, title, what

13   category, the address in the front as well as on

14   the back, and the copy number of the movies because

15   there might be more than one.

16            This is what we have in our inventory.

17   We scan this, and this shows us, you know, how many

18   we have in the store.

19       Q    Did you run an inventory after this

20   incident?

21       A    Yes, I did, a month later.

22       Q    What did you learn?

23       A    I learned that I was missing these

24   titles, and they were gone from that section.  Of

1    course, it had been broken into.

2        Q    Prior to coming the 21st at 6:00 o'clock

3    in the morning, when had you last seen these

4    numerous videos that are before you today?

5        A    The night before.

6        Q    I'd like to show you the defendant, Mr.

7    Griffin.  Do you know this man?

8        A    No, I don't.

9        Q    Did you ever give him permission to take

10   those videos in People's Exhibit No. 4 --

11       A    No, I did not.

12       Q    -- for identification from the store?

13       A    No, I did not.

14   MS. SCHULTZ:  Tender the witness.

15   THE COURT:  Do you want to remove the

16   exhibit?

17   MS. SCHULTZ:  I'll remove that.  I'm sorry,

18   Judge.

19   THE COURT:  You may question.

20   THE DEFENDANT:  Yes.

21

22                    CROSS EXAMINATION

23                    BY THE DEFENDANT:

24       Q    Ms. Nueva?

1          A     Um-uhm.

2          Q     Back then, you were the store manager, is

3     that correct?

4          A     Yes, I was.

5          Q     Yes.  And there's an alarm at that place

6     of business?

7          A     Yes.

8          Q     There was, right?

9          A     Yes.

10         Q     Did the alarm happen to go off because of

11    a break in at that place?

12         A     I'm not sure.  I wasn't there.  They

13    called at my home and told me there was a break in

14    after the fact.

15         Q     After the fact, but no one mentioned

16    anything about an alarm, about it going off?

17         A     I don't know who called my home.  It

18    could have been the alarm company.

19         Q     Right?

20         A     That's the company that has all our

21    contact information in case something like this

22    does happen.

23         Q     Right?  Right?

24         A     Um-uhm.

1        Q    And you told the jury that it was a month

2    later before you did inventory or something like

3    that?

4        A    Well, we have to do monthly inventories.

5        Q    Right?

6        A    Which means we have to scan everything,

7    and I had already done that.

8        Q    You had already done that?

9        A    So, I couldn't do it again until the

10    following month when I had to.

11        Q    Until the following month?

12        A    Um-uhm.

13        Q    So, during that time, during the time

14    that the crime had happened, the inventory wasn't

15    did?

16        A    I did my inventory.

17        Q    Your inventory?

18        A    Which I pulled all the reports.

19        Q    All the reports?

20        A    That had already been ran.

21        Q    Right?

22        A    I compare to what was missing.

23        Q    What was missing?

24        A    Open spots that were missing from the

1    area where this window was broken.

2        Q    It was 30 tapes altogether missing?

3        A    30 spaces.

4        Q    Out of different spaces?

5        A    Out of the same area.

6        Q    Out of the same area?

7        A    Uh-uhm.

8        Q    The picture that she showed you, you

9    know, how was a person able to go inside that

10   window and take those tapes?

11       A    Through the hole from the window.  I

12   mean, there's a shelving unit, as you can see for

13   yourself, that's right in front of the window.

14       Q    Right?

15       A    So, it's very easy for someone to put

16   their hands in there and pull the movies out.  The

17   shelving unit is right in front of the window.

18       Q    Right?  Right?

19       A    You can see where the tapes were at.

20   It's all empty now.  It's all been removed.

21       Q    The picture she's showing you there, the

22   glass is covered, isn't it, right, the glass right

23   there?

24       A    Which glass?

1      Q      The glass, you know, that was broken
2   there?

3      A      Yes.

4      Q      The person, if they are standing on the
5   outside, they couldn't know and see what's on the
6   inside?

7      A      But they could see it from the next
8   window which doesn't have the film.  You can see
9   this is a clear glass.

10     Q      When was that one, the film taken off of
11  that glass?

12     A      The film was never put onto this glass.

13     Q      Right, but the film was on the other
14  glass?

15     A      Yes.

16     Q      The one that was broken?

17     A      Um-uhm.

18     Q      The day of the crime, you never saw me in
19  your place of employment, did you, ma'am?

20     A      I didn't see you there.

21     Q      And you never saw me with any of your
22  property, did you, ma'am?

23     A      I did not see you.

24     Q      I'm sorry.  Your property came up

1    missing, but I'm the person that's being charged

2    with it, and I just have to ask you a few

3    questions.

4             Now, the alarm never went off at this

5    place, but there is an alarm there?

6       A    I don't know if it went off or not.  I

7    wasn't there.

8       Q    You wasn't there?

9       A    I left.  I put the alarm on, and I went

10   home, you know, had something to eat, so forth and

11   so on, came back home.  My brother told me there

12   was a message for me stating that someone had

13   broken into the store.

14      Q    Correct, and you was called?

15      A    I don't know who called me.  Probably,

16   most likely, the alarm company.

17      Q    The alarm company?

18      A    Yes.

19      Q    But you never was called by the Chicago

20   Police?

21      A    I wasn't at home when the phone call was

22   received.  I received a message from my brother

23   when I came home.

24      Q    Do you know when that window became

1    broken?

2         A    That night because I had closed that

3    night.  It must have been after I left that night.

4         Q    That night, about what time you think it

5    was?

6         A    I wasn't there.

7         Q    Right, but what time did you leave?

8         A    I left around 1:20, 1:30 in the morning.

9         Q    In the morning?

10        A    Uh-uhm.

11        Q    And the window wasn't broken then?

12        A    No, it was not.

13        Q    Do you know what caused the window to

14   become broken?

15        A    I don't know.  I wasn't there.

16        Q    Do you know if any evidence was found

17   that would have caused that window to be broken?

18        A    I was not there.

19        Q    You wasn't there, but the window became

20   broken, and you wasn't there, and the alarm never

21   went off or anything?

22        A    I don't know.  I wasn't there.

23        Q    So, you wasn't there.  Okay.  But 30

24   tapes came up missing somehow?

1        A     There was 30 open spaces.

2        Q     Open spaces?

3        A     Which means 30 items were there, whether

4    they were tapes or cover boxes or DVDs, that I

5    found out later when the inventory was done.

6        Q     You found out later?

7        A     Uh-uhm.

8        Q     A month later?

9        A     No.  When I did it myself that morning.

10       Q     That morning?

11       A     Yes.

12       Q     So now, you say that the tapes was on

13   like a stand or something?

14       A     Just a shelving unit.  It's all shelves.

15       Q     Right?

16       A     Uh-uhm.

17       Q     And it's all over the store, right?

18       A     All around the store.

19       Q     All around?

20       A     Including also the middle parts, but this

21   is all around the store where there are windows.

22       Q     So, a person couldn't possibly stick

23   their hands in the window and grab anything because

24   you don't have the things to the window where they

1    could just --

2        A    Yeah, they can.

3        Q    It's put like that?

4        A    Yeah.

5        Q    You can see it?

6        A    It in the picture.

7        Q    Someone put it like that?

8        A    That's how it's made.

9        Q    That's how it's made?

10       A    The shelving units are all around the

11   store and all around the store.  There may be areas

12   where there's windows such as these.

13       Q    I'm sorry.  Your stuff come up missing,

14   but 30 tapes --

15       A    Uh-uhm.

16       Q    -- altogether came up missing that was

17   recovered, is that correct, on the day that the

18   crime happened, is that correct?

19       A    I didn't recover the tapes myself, but

20   yes, the police had.

21       Q    Now, you appeared before Judge Gerald T.

22   Wienicki, do you remember, back on February the 27,

23   2004, that was preliminary hearing?

24       A    Yeah, I remember that.

1      Q    You never told him that 30 tapes came up

2    missing at your place, did you?

3      A    Yes, I did.

4      Q    You did?

5      A    Um-uhm.

6      Q    You sure you told him 30 tapes came --

7      A    Yes.

8      Q    -- came up missing?  Well, there's no

9    mention --

10    MS. SCHULTZ:  Objection.

11    THE DEFENDANT:

12      Q    -- in the statements that 30 tapes came

13    up missing?

14    THE COURT:  Sustained to the form of the

15    question.

16    THE DEFENDANT:

17      Q    From the preliminary hearing statement

18    that was given before Judge Gerald T. Wienicki on

19    February 27, 2004, you appeared before the Judge?

20      A    Yes, I did.

21      Q    And there's no mention anywhere in the

22    preliminary hearing before Judge Gerald T. Wienicki

23    where you gave statements that 30 tapes came up

24    missing?

1        A    I told him.

2        Q    Here it is, black and white.

3        MS. CALLAS:  Objection.

4        THE COURT:  Sustained to the form of the

5    question.  You have to ask it a different way, sir.

6        THE DEFENDANT:

7        Q    Well, the preliminary hearing, you

8    appeared before this Judge?

9        A    Yes, I did.

10       Q    And it shows no record or no statement

11   and Yvette Nueva --

12       A    Yes.

13       Q    -- is that correct?  Okay.

14            And it shows no testimony that 30 tapes

15   came up missing?

16       A    Where does it show that?  I don't even

17   know.

18       THE COURT:  Mr. Griffin, if you want to ask a

19   question --

20       THE DEFENDANT:  I'm asking.

21       THE COURT:  -- you have to refer to a specific

22   question and answer.  It's not just a statement

23   that's given.  It's a question and answer process.

24       THE DEFENDANT:  Right.

1          Q      Statement never was given that 30 tapes

2     --

3          A      It must have been given that day, yeah.

4          Q      -- where he --  I have it in black and

5     white.  February --

6          MS. SCHULTZ:  Objection, irrelevant.

7          THE DEFENDANT:

8          Q      -- 27, 2004?

9          THE COURT:  Objection sustained.  Ask another

10    question, please.

11         THE DEFENDANT:

12         Q      And you don't know how that window became

13    broken on what caused that?

14         A      I know it was broken after hours.

15         Q      After hours?

16         A      On that night.

17         Q      On that night, right?

18         A      After I left.

19         Q      After you left?

20         A      After I left the premises, locked the

21    store up, and put the alarm off.

22         Q      Right?

23         A      That's when the window was broken.  I

24    don't know what time in the morning, but it was

1   broken that night.

2           THE DEFENDANT:  Right.  I'm sorry your

3   property came up missing, but I'm the person they

4   charged with it.

5               No further questions, your Honor.

6           THE COURT:  Thank you.  Any further questions

7   of this witness?

8           MS. SCHULTZ:  Just very briefly.

9

10                          REDIRECT EXAMINATION

11                          BY MS. SCHULTZ:

12          Q    At the preliminary hearing on February

13   27, 2004, before testifying before the Judge, you

14   spoke to Assistant State's Attorney Suzanne Kraus,

15   is that correct?

16          A    Yes, I believe.

17          Q    And you told her how many --

18          A    Yes.

19          Q    -- tapes had been missing?

20          A    Yes.

21          Q    Do you recall specifically -- have you

22   read that transcript?  You testified --

23          A    No, I have not.

24          Q    You don't have an independent

1    recollection as to what questions were asked and

2    what answers were made?

3         A    No, I don't.

4         Q    The proceeds that you were asked at the

5    proceeding, correct?

6         A    Yes.  I even offered to bring inventory

7    reports, if needed, for the case.

8         Q    This is not when you were questioning in

9    front of Judge --

10        A    When I was talking to the person, the

11   State's Attorney.

12        Q    The State's Attorney?

13        A    Uh-uhm.

14        Q    So that we're clear, some of it was taken

15   down by a court reporter, correct?

16        A    Um-uhm.

17        Q    And other parts of your conversation was

18   just you having conversation with the State's

19   Attorney?

20        A    Correct.

21        Q    And your recollection that you told the

22   State's Attorney during the conversation about the

23   tapes, correct?

24        A    I did tell someone about the tapes and

1      how many there were, and I even offered inventory

2      reports showing the titles of the movies that were

3      missing, if they needed to have that type of

4      information.

5          Q    But that information that you're talking

6      about now is not done in front of the Judge and

7      proceedings similar to this, was it?

8          A    No.  I was never in a room or with a

9      Judge or trial or anything like this.

10         Q    But you did testify before the Judge?

11         A    Yes, I did.

12         Q    But there were different questions asked

13     at that time?

14         A    Yes, very few questions, not as elaborate

15     as these.

16         Q    Okay.  Great.  There were 27, either DVDs

17     or VHSs, inventoried?

18         A    Uh-uhm.

19         Q    Can you explain the discrepancy of the 3

20     other tapes?

21         A    It could have just been an empty box, or

22     they could have been checked out at the time when I

23     counted 30 spaces.  You know, when the movies are

24     checked out, of course, there's nothing there but

1      the cover boxes which is what you see here.

2                  The ones with the pictures, those are

3      left behind to hold the place.  And I remember

4      there was 3 movies that I always was missing the

5      box for, and it was in that area.  It was a foreign

6      movie, and eventually, I had to take them off the

7      shelves because I didn't have any displayed for

8      them.  So, it's pointless to keep them there.

,9             MS. SCHULTZ:  Thank you.

10             THE COURT:  Any further questions based on

11      that?

12             THE DEFENDANT:  Yes.

13

14                        RECROSS EXAMINATION

15                        BY THE DEFENDANT:

16         Q    Ms. Nueva, you said that you had told

17      another State's Attorney at another proceeding that

18      the tapes, 30 tapes had came up missing?

19         A    Yes.

20         Q    And she wouldn't allow you to mention it

21      to the Judge on February 27, 2004, in front of

22      Judge Gerald T. Wienicki?

23             MS. SCHULTZ:  Objection.

24             THE COURT:  Sustained to the form of the

1    question.

2         THE DEFENDANT:

3         Q    You told a State's Attorney that they

4    came up missing?

5         A    Yes.

6         Q    And did she write that down anywhere that

7    30 tapes came up missing?

8         MS. SCHULTZ:  Objection.

9         THE COURT:  She can answer, if she knows.

10        THE WITNESS:

11        A    I mean, I don't know.  She probably did

12   write it down.

13        THE DEFENDANT:

14        Q    On an important crime as there is 30

15   tapes came up missing, and she wouldn't allow you

16   to give the statement to the Judge that they came

17   up missing --

18        MS. SCHULTZ:  Objection.

19        THE WITNESS:

20        A    I only answered the questions that were

21   asked of me at the time.  If they weren't asked of

22   me at the time, I didn't answer.  I just asked what

23   was asked of me.

24

1          THE DEFENDANT:

2          Q    And during crimes like this here, by you

3    having been the manager there, am I correct, you

4    was the manager at that time?

5          A    Yes, I was the store manager.

6          Q    You was the store manager, but you

7    mentioned it to the State's Attorney and at a

8    separate place right before you appeared before the

9    Judge, right?

10         A    Correct.

11         Q    You had mentioned it to her?

12         A    Uh-uhm.

13         Q    And she wouldn't ask you the question how

14   many tapes had came up missing?

15         MS. SCHULTZ:  Objection.

16         THE COURT:  Sustained.

17         THE DEFENDANT:

18         Q    Is that correct?

19         THE COURT:  Ask another question.

20         THE DEFENDANT:

21         Q    Did you at any time tell any Judge what

22   came up missing?

23         MS. SCHULTZ:  Objection.

24         THE COURT:  Sustained to the form.  You can

1    ask her a specific question, and if she was asked

2    that question and gave that answer; but you cannot

3    ask the question in the form you're asking it, sir.

4          THE DEFENDANT:

5          Q    You told the State's Attorney that it

6    came up missing?

7          MS. SCHULTZ:  Objection, asked and answered.

8          THE COURT:  The question's been asked numerous

9    times and answered numerous times.  The objection

10    is sustained.

11          THE DEFENDANT:

12          Q    But you never went on record and told

13    anyone that 30 tapes came up missing, did you,

14    ma'am?

15          MS. SCHULTZ:  Objection.

16          THE COURT:  Objection sustained.  Any other

17    questions?

18          THE DEFENDANT:  No further questions, your

19    Honor.

20          THE COURT:  Any other questions from the

21    State?

22          MS. SCHULTZ:  No, Judge.

23          THE COURT:  Thank you very much.

24                          (Witness excused.)


P - 96

1          THE COURT:  Any additional witnesses?

2          MS. CALLAS:  No, Judge.

3               At this time, State is seeking leave to

4     strike all the identification marks from People's

5     Exhibits -- 1 through 2 have already been

6     admitted.  We'd seek leave to strike the

7     identification marks from People's 3 and People's 4

8     and ask that they now be admitted.  So, People's 1

9     through 4 are all admitted into evidence.

10         THE COURT:  Any objection?

11         THE DEFENDANT:  No objection.

12         THE COURT:  1 through 4 -- 1 and 2 have

13    previously been admitted.  3 and 4 will be admitted

14    at this time.

15         MS. CALLAS:  And with that, the People rest.

16         THE COURT:  And at this time, we're going to

17    take a short recess.

18         THE DEFENDANT:  Your Honor, before we take our

19    recess, the defense would like to present to the

20    jury --

21         THE COURT:  Hold on, sir.  We'll address the

22    defense after we take a short recess.  At this

23    time, we're going to take a recess.  I think lunch

24    is ordered.  It should be here shortly.  So, we'll

1    break for lunch as well.

2                    (Whereupon, the jury left the courtrom

3                    after which the following proceedings

4                    were had:)

5        THE COURT:  So, the State has not rested, and

6    I know you have --

7        MS. CALLAS:  We're willing to just keep

8    working right now.  So, go ahead.

9        THE COURT:  Lunch has been ordered.

10       A DEPUTY:  My sergeant said we have ordered it

11   but because -- due to the weather and stuff, not

12   until after 1:00.

13       MS. CALLAS:  If it's right after 1:00, that's

14   all right.

15       THE COURT:  And then, Mr. Griffin, the State

16   has not rested their case.  We're going to turn to

17   the defense portion of the case, and are you going

18   to call any witnesses or present any evidence?

19       THE DEFENDANT:  Yes, ma'am.

20       THE COURT:  Who are you going to call as

21   witnesses?

22       THE DEFENDANT:  I would like to present

23   evidence, your Honor.

24       THE COURT:  How are you going to do that,

1    sir?

2         THE DEFENDANT:  I would like to present to the

3    jury the preliminary before Judge Gerald T.

4    Wienicki on the 27th, 2004, of February.  I would

5    like to present that to the jury as evidence

6    concerning the tapes, that no tapes were ever

7    mentioned that came up missing from the manager of

8    the store.

9         THE COURT:  So, you're seeking to introduce

10   the actual transcript?

11        THE DEFENDANT:  The whole transcript, yes,

12   ma'am.

13        THE COURT:  State?

14        MS. CALLAS:  No objection.

15        THE COURT:  You have no objection?

16        MS. CALLAS:  No.

17        THE COURT:  Typically, that would not come

18   into evidence, sir.  If the State has no objection

19   to that coming into evidence --

20        MS. CALLAS:  As long as it's clear on the

21   record that this is something the defendant wants

22   admitted, and we are not asking that this be given

23   to the jury.

24        THE DEFENDANT:  Yes.  I want it to be given to